UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

**UNITED STATES OF AMERICA**

v.  407CR037

**JOSE MARTIN OROZCO-CUELLAR, and
MARTIN VILLEGAS-TELLO**

## ORDER

## I. INTRODUCTION

Defendants Jose Martin Orozco-Cuellar ("Orozco") and Martin Villegas-Tello ("Villegas") were indicted for violating 21 U.S.C. § 846 by conspiring to possess with intent to distribute (count one) marijuana and import (count two) marijuana. Doc. # 17. At a joint trial the jury convicted them on count one and acquitted them on count two. Doc. # 160.

Orozco now moves for a judgment of acquittal or, alternatively, a new trial. Doc. # 164. Villegas renews the motion for judgment of acquittal that he unsuccessfully made at trial, and alternatively moves for a new trial. Doc. ## 163, 165.

## II. BACKGROUND

In 1/07, Customs officers noticed -- in a Mexico-originated shipment entering the port of Savannah, Georgia -- a suspicious container purporting to contain powdered laundry detergent. Upon further inspection, the officers found bricks of marijuana concealed in the powder. Since the shipment was en route to an Atlanta, Georgia warehouse, the officers set up a controlled delivery.

Upon the shipment's delivery in Atlanta, agents arrested Eva Partida after she arrived to count the container's boxes of "soap powder." Partida was employed by Eduardo Diaz, whose dummy corporation was the intended final recipient of the shipment. In other words, the corporation and its office (consisting of nothing more than a desk, a telephone and 200 square feet of space) were false fronts for his illegal operation. The agents then used her phone and tried unsuccessfully to set up a meeting with Diaz.

A warehouse employee did, however, speak with Diaz and told him that a large truck was required to pick up this load. Apparently someone named Gilberto Torres, at Diaz's direction, had rented a 17 foot U-Haul truck the previous day. After the warehouse employee spoke with Diaz, Torres returned the truck to U-Haul. Defendant Villegas arrived at the store, talked with Torres outside, and then Villegas rented a larger truck.

Villegas testified before the grand jury that he then drove to a K-Mart parking lot and left the keys in the truck. Someone else took it from there. The truck arrived at the warehouse and undercover agents helped load it. A different individual then drove the truck back to the K-Mart, where Villegas retrieved it and drove it North on Interstate 85 out of Atlanta.

Villegas had initially traveled to Atlanta from South Carolina with another man, Isidro Pulido. During Villegas's I-85 drive from Atlanta, Pulido drove a separate, Villegas-owned van in tandem with him. In fact, Pulido followed closely behind Villegas, and they switched lanes together. Both drivers stopped at Exit 126 to fill up on gas. They then drove three more miles and stopped at Exit 129, where they met Orozco.

While Orozco filled up on gas, Villegas exited the U-Haul to speak with him, then returned to the U-Haul. Orozco then walked over to Pulido and they conversed briefly. At that point, Orozco stopped traffic in the parking lot to help Villegas back the U-Haul out.

Orozco then got back in his car and all three exited the gas station to head back up I-85 northbound.

Agents followed the three cars, which proceeded in tandem -- Orozco in front, Villegas second (in the U-Haul truck with the drugs), and Pulido in the rear. They maintained a tight formation (one to two car lengths between each vehicle), preventing other cars from driving in between them. They also switched lanes together; normally the last car would switch lanes and block traffic so the first two could switch as well. Agents pulled them over after they drove approximately forty miles in this manner.

After the stop, agents decided to move all of the vehicles to a nearby weigh station due to the heavy traffic on the interstate. In the weigh station parking lot, Orozco agreed to speak with Agent Blankley (U.S. Immigration and Customs Enforcement). While Blankley transported Orozco to the weigh station office, the two had the following exchange initiated by Orozco:

> Orozco: The green's not mine, the green's not mine.
>
> Agent Blankley: Green? What green?
>
> Orozco: The green. It's not mine.
>
> Agent Blankley: The green? The marijuana?
>
> Orozco: Yes, it's not mine.
>
> Agent Blankley: Whose is it?
>
> Orozco: It's the young guy. The young guy is who told me what was in it.

According to the agent, Orozco pointed to Pulido when referencing the "young guy."

After arresting all three men, the agents found "direct connect" cell phones on each of them. Direct connect phones can be used like a walkie-talkie, but when used in this manner they do not, unlike normal cell phones, generate a cell phone company call record. One agent testified that, based on his experience, direct connect phones are commonly used by drug dealers because the phone companies cannot log their calls (such phones only keep an internal record of direct connect calls). After obtaining a search warrant, one agent looked through the internal records of the phones; they showed that Orozco and Villegas had direct-connected with Pulido that day.

Each individual's phone was registered under a false name. Villegas's phone was registered to "Dee Tee" while both Orozco's and Pulido's were registered to "John Wayne." Villegas's and Orozco's had the same South Carolina billing address. While Villegas had owned his phone for some time, Orozco obtained his the day before their arrest and Pulido had purchased his just a few days prior to that.

Villegas later testified before the grand jury that a man named Cooco Lagunas promised him $500 for driving to Atlanta to pick up "furniture." Supposedly they met at a party once, but Villegas did not consider Lagunas a friend. Lagunas told him to go to an Atlanta Burger King where another man, Pedro Gallegos (whom Villegas also did not know), would give him further instructions. According to Villegas, Gallegos met him at the Burger King and told him to rent a U-Haul, then leave it in the K-Mart parking lot with the keys inside. Someone else would then load it and return it to Villegas at the K-Mart. Villegas also testified that he did not know to whom he was delivering the "furniture," but pursuant to a "previous

2

arrangement" someone would flash their bright lights at him in a South Carolina Home Depot parking lot. His testimony thus recounted highly suspicious activity despite his claimed belief that he was to haul furniture, not marijuana.

At trial, both defendants unsuccessfully moved for a judgment of acquittal at the close of the evidence. Villegas also moved for a mistrial, claiming that the introduction of certain statements made by codefendant Orozco violated his Sixth Amendment rights under the Confrontation Clause, as illuminated in *Bruton v. U.S.*, 391 U.S. 123 (1968) (a defendant is deprived of his Confrontation Clause rights when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, despite a limiting instruction to consider the statement only against that codefendant). That, too, was denied.

III. ANALYSIS

Again, both defendants move for a judgment of acquittal or, alternatively, a new trial under F.R.Cr.P. 29 and 33 respectively. Under Rule 29, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Rule 29. Rule 33 gives a court discretion to "grant a new trial if the interest of justice so requires." Rule 33.

On a Rule 29 motion, a court "must decide whether the evidence, examined in a light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *U.S. v. Williams*, 390 F.3d 1319, 1323 (11th Cir. 2004) (quotes and cites omitted). "All credibility choices must be made in support of the jury's verdict." *Id.* And, "a jury is free to choose among reasonable constructions of the evidence." *Id.* "Thus, [i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 1323-24.

On a Rule 33 motion for new trial based on the weight of the evidence (as the defendants raise here), "the court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses." *U.S. v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (quotes and cite omitted). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* But "courts are to grant [motions for new trials] sparingly and with caution, doing so only in those really exceptional cases." *U.S. v. Aguilar*, 188 Fed.Appx. 897, 901 (11th Cir. 2006) (brackets original; quotes omitted).

Here a jury convicted both defendants as members of a conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846. To sustain these convictions, the Government had to adduce sufficient evidence to prove beyond a reasonable doubt that: (1) an illegal agreement existed to possess with the intent to distribute a controlled substance; (2) the defendants knew of this agreement; and (3) the defendants knowingly and voluntarily joined the agreement. *U.S. v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002). While this case involved marijuana, the Government need only have

3

proved that the defendants knew they were dealing with a controlled substance. *U.S. v. Mejia*, 97 F.3d 1391, 1393 (11th Cir. 1996).

Direct evidence of every element of a conspiracy is not required. *U.S. v. Iglesias*, 915 F.2d 1524, 1527 (11th Cir. 1990). While "[c]lose association with a co-conspirator or mere presence at the scene of a crime is insufficient evidence of knowing participation in a conspiracy," a defendant's "[p]resence is a material and probative factor that the jury may consider in reaching its verdict." *Id.* Additionally, "[t]he government may prove that a defendant knowingly participated in a conspiracy through proof of surrounding circumstances such as acts committed by the defendant that furthered the purpose of the conspiracy." *Id.*

In the end, the Government did not have to prove here that each defendant knew every detail or participated in every stage of the conspiracy. *Charles*, 313 F.3d at 1284. But the Government *did* have to prove that each defendant knew the essential nature of the conspiracy. *Id.*

### A. Orozco-Cuellar

The evidence that the Government presented in this case is more than sufficient to sustain Orozco's conviction. That evidence showed that: (1) Orozco traveled from South Carolina to Georgia to meet Villegas and Pulido, who had picked up the drugs; (2) Orozco spoke with both of these men upon meeting them at a gas station; (3) Orozco then helped block traffic so that Villegas could maneuver the U-Haul out of his parking spot; (4) Orozco possessed a direct connect phone registered in the false name of "John Wayne" that he had acquired the previous day; (5) these phones are commonly used by drug dealers because direct connect conversations do not leave a log with the phone company; (6) Orozco acted as the lead car in a three-car convoy that mimicked each other's maneuvers to protect the middle car carrying the marijuana; and (7) while in custody, Orozco tried to exculpate himself by claiming "[t]he green's not mine, the green's not mine" while referring to the marijuana in the U-Haul and fingering Pulido for his knowledge of the U-Haul's contents.

The jury was authorized to find that there was an agreement to possess with intent to distribute drugs -- as evidenced by the marijuana found in the laundry detergent imported from Mexico, the movement of it to an Atlanta warehouse, the U-Haul rental, the loading of the shipment into the U-Haul and its subsequent transportation to South Carolina. Orozco demonstrated his knowledge of this illegal agreement when he attempted to exculpate himself. He admitted that he knew marijuana was in the U-Haul when he insisted that it was not his. Finally, Orozco's knowing and willful joinder in the agreement is shown by his acts furthering the purpose of the conspiracy. He drove from South Carolina to meet Villegas and Pulido in Georgia, then acted as the lead car forming a protective convoy.

That evidence was sufficient to support the jury's guilty verdict. And, it does not run sufficiently against the verdict such that a serious miscarriage of justice may have occurred. Orozco's motions for judgment of acquittal and for a new trial therefore are denied.

### B. Villegas-Tello

Prior to trial, Villegas filed a motion *in limine* to exclude codefendant Orozco's exculpatory statements ("The green's not mine, the green's not mine....) at trial. Doc. # 138. He

4

insisted that these statements violated his Sixth Amendment Confrontation Clause rights as articulated in *Crawford v. Washington*, 541 U.S. 36 (2004) (prohibits courts from admitting out-of-court testimonial statements, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him) and *Bruton,* 391 U.S. at 135-36 (a defendant is deprived of his Confrontation Clause rights when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is told to consider the statement only against that codefendant).

However, the Court determined that Orozco's exculpatory statements only implicated the younger co-conspirator, Pulido (and thus not Villegas), so it denied any relief because neither *Bruton* nor *Crawford* applied. *See* doc. # 141. It also denied Villegas's trial objection to the admission of Orozco's statements. Villegas's current motions for judgment of acquittal and a new trial hinge on similar *Bruton* arguments and an evidentiary-insufficiency contention.

### 1. *Bruton*

The *Bruton* Court held that the admission of a non-testifying codefendant's confession which "expressly implicat[ed]" another defendant violated that defendant's Confrontation Clause rights. *Id.*, 391 U.S. at 124 n. 1, 135-36. Despite an instruction to the jury to consider the confession only against the co-defendant there, the Court concluded

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id.* at 135-36 (cite omitted).

However, in *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court held that

> the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

*Id.* at 211. The Court concluded that *Bruton* "recognized a narrow exception" and juries *could* properly follow a limiting instruction when the confession did not *facially* incriminate a defendant. *Id.* at 207, 211.

Here, *Bruton* is not applicable. While Orozco did not testify, his exculpatory statements were not a confession and did not facially or even *implicitly* incriminate Villegas. Again, Orozco merely stated (as recounted by Agent Blankley) that "the green's not mine" -- thus referring to the marijuana. When asked whose it was, Orozco responded, "It's the young guy. The young guy is who told me what was in it." Agent Blankley then clarified that Orozco had pointed to *Pulido*, not Villegas, when he made that statement.

Villegas nevertheless insists that *Bruton* applies because the jury could infer that the marijuana was either Pulido's *or* Villegas's from Orozco's statement that it was not his. Again, however, Orozco only mentioned Pulido when asked to whom the marijuana belonged,

5

and while juries can infer a lot of things, the statement here does not match the incriminating strength found to have crossed the line in *Bruton*.

Villegas also argues that, since Pulido told Orozco the contents of the U-Haul, a jury could infer that Pulido told Villegas the same thing. Doc. # 163 at 4. Citing *U.S. v. Ramirez-Perez*, 166 F.3d 1106, 1109-1110 (11th Cir. 1999), Villegas insists that such potential inferences from a non-facially incriminating statement[1] are covered and thus banned by *Bruton*. But in *Ramirez-Perez*, the government conceded that the admission of the statements constituted a *Bruton* error. Thus the court there never performed any *Bruton* analysis, only a harmless error analysis.[2] Here the Government has made no such concession.

---

[1] In that case, the trial court allowed into evidence a codefendant's (Homero's) confession that he (Homero) had asked that a pistol be brought to a drug transaction. A different defendant (Maclavio) had already admitted that he (Maclavio) had brought the gun to the drug transaction, so that codefendant Homero's confession effectively informed the jury that he (*i.e.*, Homero) had asked Maclavio to bring the gun. Based on that connection, the Eleventh Circuit found that admission of Homero's statement erased all other possible inferences for why Maclavio brought the pistol with him. Therefore by that point in the trial, the jury knew that Maclavio had brought the gun at codefendant Homero's behest. That raised the strong inference that Maclavio knew why he was bringing the gun (*i.e.*, for protection at a drug transaction). Thus its admission was not harmless error. *Ramirez-Perez*, 166 F.3d at 1109-1110.

[2] Because no *Bruton* analysis was performed, *Ramirez-Perez* provides no information on how the codefendant's statements were admitted. In other words, no information is supplied on whether the codefendant's statements were admitted as substantive evidence against the defendant or whether a limiting instruction was given. It tells this Court nothing about analyzing statements for a *Bruton* error.

For that reason, *U.S. v. Williamson*, 339 F.3d 1295 (11th Cir. 2003) is more informative. That case, involving conspiracies to commit mail fraud and money laundering, held that admission of a non-testifying codefendant's confession that does not implicate (directly or otherwise) the defendants, coupled with a limiting instruction by the court, does not violate *Bruton*. *Williamson*, 339 F.3d at 1303.

There the codefendant's confession stated "he was being paid because of his having gotten the recycling resolution passed and for giving Big Wheel the discounted rate of $8.75 a ton for dumping debris at the Etowah Solid Waste Disposal Authority." *Id.* at 1302. The protesting defendants owned Big Wheel and, since the statement facially implicated the company, they argued, it "necessarily implicat[ed] them in violation of *Bruton*." *Id.* But the Eleventh Circuit disagreed:

> The statement itself is silent as to who paid [the codefendant]. Furthermore, even assuming that it is self-evident that [Big Wheel] was paying [the codefendant] for passing the resolution and giving the discounted rate, naming [Big Wheel] does not facially implicate either [of the defendants]. In order to make that inferential link, additional, independent evidence is needed. Simply because the government provided the jurors with the independent evidence needed to make that link does not create a *Bruton* violation. What the government accomplished in this case is what the Supreme Court specifically authorized in *Richardson*.

*Id.* at 1303-04. Because the district court gave a limiting instruction as to its use and the confession did not facially implicate the defendants, no *Bruton* violation occurred. *Id.*; *see also U.S. v. Valdes-Fiallo*, 213 Fed.Appx.

957, 960 (11th Cir. 2007) ("Only those statements by a non-testifying co-defendant that directly inculpate the defendant give rise to a constitutional violation").

Here, Orozco's statement does not implicate (facially or otherwise) Villegas and the Court gave a proper limiting instruction in its charge to the jury:

> When the Government offers testimony or evidence that a Defendant made a statement or admission to someone, after being arrested or detained, the jury should consider the evidence concerning such a statement with caution and great care. It is for you to decide (1) whether the Defendant made the statement and (2) if so, how much weight to give to it. In making these decisions you should consider all of the evidence about the statement, including the circumstances under which the Defendant may have made it. *Of course, any such statement should not be considered in any way whatsoever as evidence with respect to any other Defendant on trial.*

Doc. # 155 at 4 (emphasis added). Thus, no *Bruton* violation occurred upon admission of Orozco's exculpatory statements.

Villegas insists, however, that a *Bruton* error did occur because the Government, over Villegas's objection, told the jury during closing argument that it could infer Villegas's guilty knowledge from Orozco's statement. Doc. # 163 at 4-5. But the Government made no such statement. What Villegas alludes to is the following Government comment about his knowledge:

> But how do we know that he knew he was transporting drugs. Well, he's working together with all of these people, who obviously know that they were transporting drugs.

Doc. # 168-2 at 39-40. Villegas's objection to this comment was overruled.

He now argues that this statement compounded with Orozco's exculpatory statements to constitute a *Bruton* violation. But the Government's closing argument never referred to Orozco's statement as evidence of Villegas's knowledge. Each time the Government mentioned Orozco's statement it only used it as proof of Orozco's knowledge. *See* doc. # 168-2 at 5, 9, 18, 42. The Government's remark about inferring knowledge based on others' knowledge simply does not reference Orozco's exculpatory statement.

In fact, the Government followed that comment with references to the individuals in Atlanta who ordered the shipment to their dummy corporation, Villegas's renting of the larger U-Haul truck, his meeting with Gilberto Torres who rented the first truck, and his cell phone with a faked name. *Id.* at 40-41. Then, before referencing Orozco's statement again, the Government clearly shifted its focus: "Now as [to] the knowledge of Mr. Orozco-Cuellar, as I mentioned before, he has admitted that he knows there is marijuana in that U-haul." *Id.* at 42.

Nothing in the Government's closing argument raised a *Bruton* problem. Thus, there was no reversible error committed by the Court and Villegas's motions for a judgment of acquittal or a new trial on this issue are denied. Doc. ## 163, 165.

## 2. *Sufficiency of the Evidence*

Villegas next contends that the Government never proved beyond a reasonable doubt that he knew drugs were involved. Doc. # 163 at 2. But the evidence presented is sufficient to sustain the jury's verdict. It showed that Villegas drove from South Carolina to Atlanta the day before the drugs were picked up. When the warehouse manager informed Diaz (whose business originally ordered the shipment) that he needed a larger truck, Villegas went to the U-Haul store, talked outside with Torres (who had rented the smaller truck), and then rented the necessary vehicle. Villegas then drove the truck to a K-Mart parking lot and left the keys in the truck for some unknown person to pick it up and load it. After it was loaded, a different person dropped the truck off at the K-Mart, where Villegas took control of it.

On top of all that, Villegas actually drove the load of marijuana. He then started up I-85 north with Pulido following closely behind in a van. After stopping to get gas at one exit, Villegas stopped at the very next exit to meet Orozco. Then all three cars drove in tandem, switching lanes together and preventing other cars from getting in between them -- until they were stopped by officers. The agents then found that Villegas had a direct connect cell phone registered to a fake name. As one agent testified, these types of cell phones are commonly used in the drug trade.

Furthermore, Villegas's grand jury testimony was introduced as substantive evidence of his guilt. *See U.S. v. Washington*, 431 U.S. 181, 186 (1977) (a defendant's grand jury testimony may properly be used against him in a subsequent trial). Villegas testified that he thought he was transporting "furniture" and proceeded to tell his highly suspicious account of how he was hired and the instructions he received. The jury heard his answers, and it was authorized to find them evasive, incomplete, and inconsistent with the transportation of furniture.

By testifying before the grand jury, Villegas ran the risk that the petit jury would disbelieve his previous testimony and instead use it to establish his guilt. *U.S. v. Slone*, 833 F.2d 595, 601 (6th Cir. 1987) ("To the extent that it was implausible, appellant's grand jury testimony tended to establish his guilt and could properly be used against him as an admission"); *see also U.S. v. Ellisor*, ___F.3d___, 2008 WL 919670 at * 12 (11th Cir. 4/07/08) ("The [trial] jury was free to disbelieve Ellisor's statements and to take them as substantive evidence to the contrary"); *U.S. v. Svete*, ___F.3d___, 2008 WL 788407 at * 5 (11th Cir. 3/26/08) ("Not only was the [trial] jury entitled to disbelieve [the defendant], it was entitled to believe the exact opposite of what [he] said"); *U.S. v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("Most important, a statement by a defendant, if disbelieved by the [trial] jury, may be considered as *substantive* evidence of the defendant's guilt").[3]

A jury could infer Villegas's knowledge that drugs were involved from all of his suspicious activities in furtherance of this drug conspiracy (driver of the drugs in a tight protective formation, renting of the U-Haul, leaving the U-Haul in a parking lot with keys in it for people whom he did not know to load it, agreeing to do this at the behest of people he did not know, meetings in parking lots and fast food restaurants, delivery to unknown individuals

---

[3] While *Ellisor*, *Svete*, and *Brown* involve a defendant's testimony at trial before the jury, the Court sees no reason why the same principles do not apply to grand jury testimony read at trial and admitted as substantive evidence against the defendant.

8

who would flash their brights to let him know who they were). As if that was not enough, Villegas's implausible grand jury testimony simply bolstered the Government's case that Villegas knew exactly what he was doing. Therefore, Villegas's evidentiary-insufficience based motions for a judgment of acquittal and a new trial are denied.

## III. CONCLUSION

Defendant Jose Martin Orozco-Cuellar's motion for a judgment of acquittal or a new trial is ***DENIED***. Doc. # 164. Likewise, Defendant Martin Villegas-Tello's motions for a judgment of acquittal or a new trial are ***DENIED***. Doc. ## 163, 165.

This _5_ day of May, 2008.

*/s/ B. Avant Edenfield*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA